NATIONAL EXCHANGE BANK OF HARTFORD and others *vs.* ELI T. WILDER.

September 30, 1885.

**Pledge—Constructive Possession—Warehouse Receipt.**—While possession by the pledgee is necessary to the existence and continuance of a pledge, yet this need not be actual physical possession. The delivery of a recognized symbol of title, such as a warehouse receipt, which puts the pledgee in the control and constructive possession of the property, is sufficient.

**Pledge by Warehouseman.**—The owner of goods, *if a warehouseman*, can pledge the same by issuing and delivering his own warehouse receipt to the pledgee.

**Same—Warehouse Receipt—Commingled Wheat.**—Where the property is a part of a larger uniform mass, as wheat in an elevator, separation from such uniform mass is not necessary to constitute an appropriation of the property to the contract of pledge. The pledgee becomes tenant in common with the other owners.

**Same—Warehouse Receipt Issued on such Pledge—Warehouseman a Bailee and Pledgee a "Depositor," under Laws 1876, *c.* 86.**—Where a warehouseman pledges his own property in store in his own warehouse by issuing to the pledgee a warehouse receipt therefor, this is equivalent to an actual transfer of the possession, and renders the warehouseman bailee of the pledgee. In such case the pledgee is a "depositor" within the meaning of Laws 1876, *c.* 86, (modifying certain *dicta* in *Fishback* v. *Van Dusen*, 33 Minn. 111.) Under this statute the transaction constitutes a bailment, and not a sale, notwithstanding that the grain might be mingled with the grain of other persons, and might be shipped or removed from the warehouse.

**Same—Substitution of Other Grain by Warehouseman (Pledgor.)**—Hence, if the warehouseman (the pledgor) in the course of his business ships out the specific grain pledged, and purchases and stores in his warehouse other grain of the same kind and quality, the latter, by virtue of the provisions of the statute, takes the place of the former, and is appropriated to the contract as the property of the pledgee or depositor.

**Same—Fishback v. Van Dusen Distinguished.**—This case distinguished from that of *Fishback* v. *Van Dusen*, 33 Minn. 111, by the facts that the pledgor was a "warehouseman," and that specific property was "appropriated" to the contract of pledge.

In September, 1884, the Minnesota Elevator Company made an assignment to the respondent Wilder for the benefit of its creditors. The assignee, upon taking possession of the property of the Elevator Company, found in its warehouses about 15,779 bushels of wheat, all of which, excepting about 679 bushels, he sold for the sum of $9,029.29. After such sale the appellants, four national banks doing business in the city of Hartford, Connecticut, and creditors of the insolvent company, with claims aggregating $64,000, filed their petition in the district court for Goodhue county, setting forth their claims and that they held the warehouse receipts of the Elevator Company for 93,000 bushels of wheat, and asking that the assignee be directed to pay over to them the said sum of $9,029.69 realized by him from the sale of wheat. The assignee answered, and the matter was tried without a jury before *Crosby, J.*, who found the following to be the facts, viz.:

One C. H. Duryea was the secretary and treasurer of the Elevator Company, and executed and issued the warehouse receipts mentioned in the petition, and used the same by the authority of the Elevator Company. Ten of such warehouse receipts, for 52,500 bushels, were in the following form, (except as to date, amount, grade of wheat, and warehouse,) viz.:

"MINNESOTA ELEVATOR COMPANY, Nov. 1, 1883.

"Received in store from C. H. Duryea 5,000 bushels of No. 1 hard wheat in Fletcher warehouse, Lake City, Minn., covered by insurance policies attached, subject to his order upon surrender of this receipt and payment of charges. All perishable goods and loss by the elements, fire, and heating at the owner's risk. Rates of storage.

"5,000 bushels.

"MINNESOTA ELEVATOR Co.

"C. H. DURYEA,

"Sec'y and Treas."

Indorsed "C. H. Duryea."

The remainder of the warehouse receipts, for 42,500 bushels, were in the following form, (except as to date, amount, grade of wheat, and warehouse,) viz.:

"RED WING, MINN., May 1st, 1884.

"Received in store from the Phœnix National Bank of Hartford, Conn., 35,000 bushels of No. 1 wheat, covered by insurance, subject to its order upon surrender of this receipt and payment of charges. All perishable goods, and loss by the elements, fire, and heating, at owner's risk.　Rates of storage.

"35,000 bushels.

"MINNESOTA ELEVATOR Co.
"C. H. DURYEA,
"Sec'y and Treas."

At the time that these receipts were issued, and indorsed and delivered to the petitioners, Duryea had no wheat in store in the elevators or warehouses named, nor had he any therein stored prior or subsequent thereto.　The warehouse receipts were issued, indorsed, and delivered to the petitioners as collateral security for money loaned on the security thereof, and in consideration thereof, by the petitioners to the Elevator Company, as alleged in the petition, of which money $64,000 with interest has not been repaid, and none of the warehouse receipts mentioned have been surrendered, nor has the Elevator Company ever delivered any wheat on the receipts, or in any manner settled the same or any part thereof, and the same are now in full force and effect.

The warehouse receipts are numbered, bear date, and call for wheat of the following grades and at the following warehouses, viz. :

No. 5. Sept. 15, 1883, 5,000 bu. No. 2 hard wheat in Fletcher warehouse.

No. 2. Sept. 15, 1883, 2,500 bu. No. 2 hard wheat in Eau Claire warehouse.

No. 18. Nov. 1, 1883, 5,000 bu. No. 1 hard wheat, in Fletcher warehouse.

No. 17. Nov. 1, 1883, 3,000 bu. No. 1 hard wheat, in Reed's Landing warehouse.

No. 21. Nov. 1, 1883, 4,000 bu. No. 1 hard wheat, in Kellogg & Miller's warehouse.

No. 22. Nov. 1, 1883, 8,000 bu. No. 1 hard wheat, in Minnesota City warehouse.

No. 86. Dec. 5, 1883, 12,000 bu. No. 1 wheat in Hammond elevator.

No. 87. Dec. 5, 1883, 3,000 bu. No. 1 wheat, in Pepin warehouse.

No. 84. Dec. 5, 1883, 2,000 bu. No. 1 wheat, in Keegan warehouse.

No. 85. Dec. 5, 1883, 1,000 bu. No. 1 wheat, in Jarrett warehouse.

No. 87. Dec. 5, 1883, 2,500 bu. No. 1 wheat, in Maiden Rock warehouse.

No. 116. March 25, 1884, 12,000 bu. No. 1 and No. 2 hard wheat, in ·Wabasha elevator.

No. 118. May 1, 1884, 35,000 bu. No. 1 wheat, (warehouse not stated in receipt.)

On Sept. 15, 1883, the Elevator Company did not have any No. 2 hard wheat in the Fletcher or Eau Claire warehouses, but did have about 840 bushels of No. 1 wheat in the Fletcher warehouse, and about 1875 bushels of No. 1 wheat in the Eau Claire warehouse, on account of which the wheat receipts No. 2 and No. 5 were issued.

On Nov. 1, 1883, the Elevator Company had no No. 1 hard wheat in either the Fletcher, Reed's Landing, Minnesota City or Kellogg & Miller's warehouses, but had about 8,500 bushels No. 1 wheat in the Fletcher warehouse, about 2,250 bushels No. 1 in the Reed's Landing warehouse, about 2,670 bushels No. 1 wheat in Kellogg & Miller's warehouse, and about 5,860 bushels No. 1 in Minnesota City warehouse, and warehouse receipts Nos. 17, 18, 21, and 22 were issued on account of such wheat.

On Dec. 5, 1883, the Elevator Company had more than 12,000 bushels of No. 1 wheat in the Pepin elevator, more than 2,000 bu. No. 1 in the Keegan warehouse, more than 2,500 bu. of No. 1 wheat in the Maiden Rock warehouse, and about 73 bushels No. 1 wheat in the Jarrett warehouse, on account of which wheat the receipts Nos. 84, 85, 86, and both receipts numbered 87, were issued.

On March 25, 1884, the Elevator Company had in store more than 12,000 bushels of No. 1 wheat in the Wabasha elevator, on account of which wheat the receipt No. 116 was issued.

On May 1, 1884, the Elevator Company had in store in the Wabasha warehouse about 23,147 bushels of No. 1 wheat and 21,480

bushels of wheat of a grade inferior to No. 1, and no more, on account of which wheat the receipt No. 118 was issued.

At the time of the issue of the warehouse receipts the Elevator Company had in store in said warehouses large quantities of wheat belonging to persons other than the company, and which was held for storage, only. Such wheat was mingled in a common mass with the wheat owned by the Elevator Company. The wheat represented by the Elevator Company receipts was not at any time severed or separated from the common mass, and the petitioners did not in any manner take actual possession of the wheat represented by their receipts. No other warehouse receipts than those mentioned in the petition are outstanding against the Elevator Company.

During all the time from Sept. 1, 1883, to the time of making its assignment, the Elevator Company was from time to time receiving and shipping wheat into and out of said warehouses in its ordinary course of business; and before the making of the assignment the greater portion of the wheat called for by petitioners' warehouse receipts, without the actual knowledge or express consent of the petitioners, was withdrawn from the warehouses and sold by the Elevator Company.

At the time of the assignment the assignee found in the warehouses mentioned in the petitioners' receipts, in all, about 15,779 bushels of wheat, the greater part of which was of a grade inferior to the grade mentioned in the receipts. The assignee has sold all of said wheat, excepting 679 bushels, for the sum of $9,029.29.

The court further finds that the wheat that was in the warehouses at the time of the assignment was substantially of the same kind and quality as that which was in the warehouses at the time the warehouse receipts were issued.

As a conclusion of law the court (following *Fishback* v. *Van Dusen,* 33 Minn. 111,) held that the petitioners were not entitled to the relief prayed for, and made an order denying their petition, from which order the petitioners appeal.

*J. M. Gilman,* for appellants.

*W. C. Williston,* for respondent.

MITCHELL, J. The Minnesota Elevator Company, a corporation, owned and operated several warehouses, receiving grain from other parties for storage therein, and also buying wheat and storing it therein on its own account. At different times, from September 15, 1883, to May 1, 1884, the company obtained loans of money from certain banks, (the appellants,) and, having a large quantity of wheat of its own in store in its different warehouses, in order to secure the loans by way of pledge, it executed and delivered to the banks warehouse receipts for the same, designating therein (except, perhaps, in a single instance) the warehouses where such wheat was stored. These receipts ran directly to the banks or to the company's secretary and treasurer, who, serving as a mere conduit, transferred them to the banks by indorsement. The grade of the wheat, as described in some of the warehouse receipts, did not precisely correspond with the grade of wheat in store; as, for example, in some receipts it was described as "No. 1, hard," when, in fact, it was simply "No. 1." But inasmuch as the court finds as a fact that these receipts were intended to cover the wheat owned and held in store by the company at the time they were issued, we think that, at least between the parties, this variance or misdescription of grade is immaterial. At the times of issuing and delivering the receipts, the company had in store, in each of the warehouses named therein, large quantities of wheat, the property of other persons and not of the company, which was held for storage only. This wheat was, in each of the warehouses, mingled with that owned by the company in a common mass, and the wheat represented by the receipts was not, at any time, separated from such common mass, and the banks did not, in any manner, take actual possession of the same.

On September 2, 1884, the company, under the insolvent laws of this state, made an assignment for the benefit of creditors to defendant Wilder; the company at that time owing the banks about $60,000, for which they held the receipts as security. At the date of the assignment the wheat owned by the company in its warehouses (about 15,000 bushels) was not the identical wheat owned by it and in the warehouses at the time when the receipts were issued and delivered

to the banks, "the same having been changed by the company by constantly shipping out  *  *  *  and buying in  *  *  *  in its ordinary course of business;" but the two were of substantially the same kind and quality.   There were no warehouse receipts outstanding against the company at the date of the assignment except those held by the banks, nor were there at that time any specific liens upon or claims to the wheat (15,000 bushels) then on hand except such as are created or exist by virtue of the receipts held by the banks.   The wheat belonging to the company and in the warehouses at the date of the assignment (about 15,000 bushels) came into the hands of the assignee, who, having sóld the same, or nearly all of it, holds the proceeds subject to the order of the court.

The rule is as universal as it is elementary that possession by the pledgee is necessary to the existence and continuance of a pledge. But this need not be actual physical possession.   The delivery of a recognized symbol of title, such as a bill of lading or a warehouse receipt, which serves to put the pledgee in the control and constructive possession of the property, is sufficient.   Jones on Pledges, § 37. Where property is in store with a warehouseman, the delivery of the warehouse receipt to the pledgee carries with it the constructive possession, and from the time of the transfer the warehouseman becomes the bailee of the pledgee.   In accordance with this theory, and in harmony with the usages of trade, the tendency of the later authorities (although the proposition has been sometimes doubted or denied) is to hold that the owner of goods, *if a warehouseman,* can pledge the same by issuing and delivering his own warehouse receipt to the pledgee.   Colebrooke on Collateral Securities, § 420; *Easton* v. *Hodges,* 18 Fed. Rep. 677; *Merchants',* etc., *Bank* v. *Hibbard,* 48 Mich. 118.   The power of a warehouseman to make a delivery in this way, in case of a sale, is well settled.   *Gibson* v. *Stevens,* 8 How. 384; *Broadwell* v. *Howard,* 77 Ill. 305.   And we are unable to see any good reason founded on principle for any distinction in this regard between a sale and a pledge.   If any distinction is made, it must be a purely technical one, without practical value, and which would never commend itself to business men.   Such distinctions should be rejected by courts.   There is no good reason in the nature of things

why a delivery which is sufficient in case of a sale should not be so in case of a pledge. When the pledgeor or the vendor is a warehouse-man, the public has notice from that fact that the title and legal possession of property in his warehouse may be in others, although the actual physical possession is in himself. And where the property is a part of a larger mass of the same kind and quality, as wheat in an elevator, separation or segregation from the uniform mass is not necessary to constitute an appropriation of the property to the contract. The vendee or pledgee becomes tenant in common with the other owners. *Forbes* v. *Boston & Lowell Railroad*, 133 Mass. 154.

In this case, as appears from the findings of the court, there was an appropriation of specific property to the contract, and the elevator company was a warehouseman, and hence could create a valid pledge by issuing its own warehouse receipts. Therefore, if the identical wheat in store at the time these receipts were issued had been kept on hand, there could have been no doubt of the right of the banks to recover.

It appears that, in accordance with the usual course of business on part of the elevator company, which the banks must be taken to have known, and with reference to which they must be assumed to have contracted, the elevator company shipped and sold this wheat as suited their interest or convenience, so that no part of the original mass remained. The holders of these receipts, when they called for their wheat, could not have received the identical wheat pledged, nor any part of the immediate mass of which it formed a part. The elevator company did not always keep on hand an amount of their own grain equal to that called for by these warehouse receipts,—a state of things that might naturally be anticipated from their ordinary course of doing business. All that the banks could have expected was that, upon presentation of the receipts, the elevator company would deliver a like quantity of grain of the same kind and grade.

According to what we understand to be the almost unbroken chain of authority, such a transaction, independently of any statute changing the rule, would not be one of bailment proper, but of sale or *mutuum*, where the title of the property passed to the receiver or mutuary. It was to change the rule of law in this regard that our "ware-

house act" (Laws 1876, c. 86; Gen. St. 1878, c. 124, §§ 13–18) was passed. Under the provisions of that act, (§ 1,) "whenever any grain is delivered for storage to any person, such delivery shall, in all things, be deemed and treated as a bailment, and not as a sale of the property so delivered, notwithstanding such grain may be mingled by such bailee with the grain of other persons, and notwithstanding such grain may be shipped or removed from the warehouse, elevator, or other place where the same was stored." By virtue of the provisions of this statute, under the contract of bailment the grain subsequently purchased and stored by the warehouseman takes the place of that originally deposited by the bailee, and is appropriated to the contract so as to become the property of the latter. If this statute applies to the transactions out of which this case arose, then it follows that the plaintiff banks were entitled to the wheat in controversy. If the common-law rule, and not the statutory one, applies, then, we think, they have no claim to it.

The learned judge who tried this case was fully justified by what was said in the *Fishback Case*, (*Fishback* v. *Van Dusen*, 33 Minn. 111,) in deciding adversely to the claim of the banks, for it is there expressly stated that to bring a case within the statute there must be a delivery by an actual depositor; that it has no application to a case where a party simply attempts to pledge his own property in his own possession to secure his own debt. The *result* arrived at in that case was unquestionably correct, for Cole was in no proper sense a warehouseman, and above and beyond that there was never any appropriation of any property to the contract, and hence no title ever passed. These facts, or either of them alone, were decisive of that case, and it was therefore unnecessary to consider the statute at all.

On further reflection we are satisfied that we placed too narrow and limited a construction upon the term "depositor" as used in this statute. We still think that probably the legislature had more especially in mind the case of farmers and others who made an actual physical deposit of grain. But inasmuch as the issuing of warehouse receipts by a warehouseman for his own grain actually in store transfers the title and legal possession to the holder of the receipts, and

makes the warehouseman his bailee, we think such holder should be deemed a depositor, within the meaning of the act, the same as if he had made an actual physical deposit of the grain. In other words, the statute should be construed so as to embrace and include as depositors all who own or hold grain actually in store, whether deposited by themselves or by others to whose rights they have succeeded. We believe this to be in accordance with the usages of trade and the understanding of business men, a consideration that is entitled to great weight from the courts. It is well known that most grain warehousemen are also engaged in buying grain on their own account, which they store in common mass with that of other depositors, and that they are in the habit of making sales of this grain and transferring it by merely issuing their own warehouse receipts to the purchasers; also that they are in the habit of pledging it as security for borrowed money by issuing to the lender like receipts. In either case, whether of a purchaser or pledgee, the holders of the receipts understand (and we think business circles generally have the same understanding) that they have a valid title to or security upon the property, and have in fact the wheat "on deposit" with the warehouseman as their bailee, the same as if they had made an actual physical delivery of it into his warehouse. If the purchaser who buys the wheat of the warehouseman, and leaves it in store with the latter as his bailee, is a "depositor" within the meaning of the act, there is no reason why the pledgee who does the same thing should not also be deemed such. There is no more occasion for "two ceremonial deliveries" in the one case than in the other. For these reasons we modify what was said on this point in the *Fishback Case*, and hold that where a pledgee of the grain of a warehouseman leaves it in store with the latter as his bailee, taking a warehouse receipt therefor, he is a depositor within the provisions of the "warehouse act."

The result of what has been said is that the plaintiffs are entitled to the proceeds of the wheat in controversy, and to an order to the assignee of the elevator company to pay them over in accordance with the prayer of their petition. There is no occasion to remand

the cause to the district court. The order appealed from is reversed, and an order or judgment is hereby directed to be entered in this court in accordance with the prayer of the petitioners, directing the assignee to pay over to plaintiffs the sum of $9,029.69.