SWEDISH–AMERICAN NATIONAL BANK OF MINNEAPOLIS and Others v. FIRST NATIONAL BANK OF GARDNER and Others.[1]

April 9, 1903.

Nos. 13,322, 13,323, 13,324—(257, 258, 259).

**Elevator Company Warehouse Receipts—"System of Elevators."**

A corporation of this state, with its principal place of business at the city of Minneapolis, owned and operated a number of grain elevators in Minnesota, Iowa, Nebraska, and South Dakota. It bought and stored therein grain of different kinds, each kind commingled in a common mass with like grain of other parties stored with it as a warehouseman. In the usual course of its business the several kinds of grain were shipped out, and in place thereof similar kinds of grain were received therein by purchase, and from others for storage, so that the common mass of each kind was constantly changing. The corporation borrowed money from the several receipt holders herein. The loans were evidenced by its promissory notes, some of them payable in Massachusetts and others in Minnesota. To secure the payment thereof, it issued to the several payees warehouse receipts, specifying in each receipt, in effect, that it had received in store in its system of elevators grain of a designated kind, grade, and quality, subject to its order on the return of the receipt, which

[1] Reported in 94 N. W. 218.

was indorsed to the holder of the note it was intended to secure. Four of the receipts so issued specified the particular elevators, their location, and the amount therein of the grain covered by the receipts. Some of the designated elevators were located in Minnesota, but the greater part of them were in Iowa, Nebraska, and South Dakota. Two of the receipts designated the grain covered thereby as being "in its system of elevators," without designating any particular elevators. The corporation, being insolvent, made an assignment for the benefit of its creditors, pursuant to the laws of this state, and the trust is being administered under the direction of the courts of this state. When the assignment was made, the corporation had in its several elevators within and without this state grain of the several kinds and grades designated in its outstanding receipts, so issued to secure the payment of its notes, exceeding in the aggregate the total amount called for by such receipts. It then owed the receipt holders $140,000, and its general or unsecured creditors $450,000. All of the creditors, including the receipt holders, reside outside the states of Iowa, Nebraska, and South Dakota, and all have proved their respective claims, which have been duly allowed. The assignees took possession of all of the grain in all of the elevators, and converted it into money. This is a proceeding for an order directing the distribution of the money so in the hands of the assignees, in which the receipt holders claim a preference over and above the general creditors to the extent of the grain covered by their respective receipts. It is *held*:

## Pledge of Warehouse Receipts.

1. That the receipts, as contracts of pledge, are to be construed, in respect to their validity, independently of the promissory notes they secure and those covering grain having in part an actual situs in the different states distinctively, and in accordance with the laws of the state where the grain was situated at the time they were issued.

## Law of Situs of Grain.

2. The place of performance or enforcement of a pledge of personal property is the state where the pledge properly is actually situated, and its validity must be determined by the laws of that state.

## Common-Law Rule.

3. The receipts in question are valid as to grain covered thereby having an actual situs in this state, but invalid as to grain situated in the states of Iowa, Nebraska, and South Dakota. The statutes of those states have not changed the common-law rule as to pledges of personal property, and do not authorize a pledge of grain by the issuance of a warehouse receipt by a warehouseman for his own grain to secure his own debt in the manner here attempted.

Minnesota Statute.

4. Under the general rule that the operation of statutory law is limited to the state of its enactment, it is held that the grain and warehouse statutes of this state have no force or effect upon transactions had in a sister state, and cannot be invoked to sustain the receipts here in question.

Construction of Receipt.

5. The receipts covering grain in the "system of elevators" of the grain company, without specifying particular elevators in which it was stored, are construed to cover grain stored in Minnesota elevators only, and, within the rule of National Exch. Bank v. Wilder, 34 Minn. 149, are held valid. Such receipts are not so indefinite and uncertain as to the grain intended to be pledged as to render them inoperative and void.

Assignment for Benefit of Creditors.

6. Under G. S. 1894, § 4233, the assignee in an assignment for the benefit of creditors represents the creditors, with power to institute proceedings to set aside fraudulent or void conveyances or transfers of the assignor as to all property passing by the assignment, whether within or without the state; and the creditors have, through him, the rights of attaching creditors.

The St. Paul & Kansas City Grain Company, a corporation, having, pursuant to the insolvency laws of the state of Minnesota, made a general assignment of all its property for the benefit of all its creditors to Fred C. Van Dusen and Peter B. Smith, the assignees obtained an order from the district court for Hennepin county requiring all persons and parties interested in the assigned estate to show cause before that court why the security claimed by defendants and others should not be recognized and the proceeds thereof paid to the creditors holding the same. An order was thereafter made by the court, McGee, J., directing the assignees to pay to such creditors the proceeds of the grain represented by the warehouse receipts respectively held by them as security. From an order denying a motion for a new trial plaintiffs, Swedish-American National Bank, Barnum Grain Company, First National Bank of St. Paul, Van Dusen-Harrington Company, American Exchange Bank of Duluth, Bank of Two Harbors, Charles M. Harrington and Fred C. Van Dusen, answering general creditors, severally appealed. Reversed.

*Cohen, Atwater & Shaw,* for appellants.

As to claim of First National Bank of Gardner: At common law the respondent's warehouse receipt is invalid, and its claim for a preference must rest on some statute extending the common law. This claim is based on an alleged warehouse receipt, which ·contains the following declaration by the Grain Company: "Received "in store *in our system of elevators and warehouses* 17,000 bushels of "white oats, subject to the order hereon of ourselves, on return "of this receipt properly endorsed." The grain intended to be covered by it was part of a larger mass whose identity was constantly changing. Such an instrument at common law would create no lien or pledge of any kind. This point has been directly decided in National Exch. Bank v. Wilder, 34 Minn. 149, 156, 157.

The place of making the contract was Massachusetts, and not Minnesota; for a contract must be considered to be made in the place where it is accepted and where it first becomes a binding obligation between the parties. 7 Am. & Eng. Enc. (2d Ed.) 136; 22 Am. & Eng. Enc. (2d Ed.) 1324; Lake, Cont. 49; 2 Parsons, Cont. *582.

If the receipt is governed by the laws of Massachusetts it is invalid and creates no pledge. The common law of Massachusetts is presumed to be the same as the common law of Minnesota in the absence of proof to the contrary. Pardoe v. Merritt, 75 Minn. 12.

The tendency of modern. cases and text-writers is in favor of applying the lex situs to the absolute, as well as to the conditional transfer of personal property, just as it is applied to like transfer of real estate. Wharton, Confl. Laws (2d Ed.) §§ 297–355; Story, Confl. Laws (8th Ed.) § 383, and note; Westlake, Priv. Int. Law, § 141; Foote, Priv. Int. Jur. (Ed. 1890) 226; Dicey, Law Dom. (1896) 254; Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, 22; Loftus v. Farmers, 133 Pa. St. 97.

Whatever conflict of authority there may be on other phases of the lex situs, it is settled that in every forum the validity of a transfer, pledge or incumbrance of personal property, wherever made, must be determined by the law and policy of the place where such property is situated. Green v. Van Buskirk, 5 Wall. 307, 7 Wall. 139; Hervey v. Rhode Island L. Co., 93 U. S. 664; Dooley v.

Pease, 180 U. S. 126; Lewis v. Bush, 30 Minn. 244; Hallgarten v. Oldham, 135 Mass. 1; Pritchard v. Norton, 106 U. S. 124; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397; Story, Confl. Laws (8th Ed.) § 280; Wilson v. Lewiston, 150 N. Y. 314; Waverly v. Hall, 150 Pa. St. 466; Shoe v. Wood, 142 Mass. 563; Abt v. American, 159 Ill. 467; Ames v. Benjamin, 74 Minn. 335.

If the law of the situs is the proper law, then respondent's receipt was invalid and created no pledge whatever. Sexton v. Graham, 53 Iowa, 181; 22 Am. & Eng. Enc. (2d Ed.) 857.

Appellants have the same right to attack the validity of respondent's receipt as they would have if they were attaching creditors. Farmers L. & T. Co. v. Minneapolis E. & M. Works, 35 Minn. 543; Thomas Mnfg. Co. v. Drew, 69 Minn. 69; Kellogg v. Kelley, 69 Minn. 124. The matter is one of remedy and is, therefore, governed by the lex fori. Lewis v. Bush, supra.

The assignment laws of each state govern only assignments made within the state, and do not affect foreign assignments, even though such assignments operate on property within the state. In re Paige & Sexsmith Lumber Co., 31 Minn. 136, 138; McKibbin v. Ellingson, 58 Minn. 205, 210.

Even if the statute be eliminated, the present proceedings are ample to permit an attack on respondent's receipt by any creditor whose claim has been proved: Knoxville v. Hanirick, 67 Iowa, 583; Smalley v. Mass, 72 Iowa, 171; Overmire v. Haworth, 48 Minn. 372; Rule v. Omega Stove & Grate Co., 64 Minn. 326.

*Koon, Whelan & Bennett*, for respondents First National Bank of Gardner, Cape Cod National Bank and First National Bank of South Weymouth.

As to claim of First National Bank of Gardner: The pledge of the oats was made, and intended to be made, in Minnesota, and under and pursuant to its law. Delivery of the note and receipt to Fogg Bros. & Co. was essential to make the note a valid and binding contract, and to pledge the oats to secure its payment. Jones, Pledges, §§ 23, 80; Stein v. Passmore, 25 Minn. 256.

The transfer and delivery of the warehouse receipt, by the Grain Company to Fogg Bros. & Co., was equivalent to delivery

to them of the oats themselves. Jones, Pledges, § 280; G. S. 1894, § 7649; Nat. Exch. Bank v. Wilder, 34 Minn. 149; Barrett v. Dodge, 16 R. I. 740, 743; Kirkman v. Bank, 2 Cold. (Tenn.) 397; Canterbury v. Bank, 91 Wis. 53; Johnson v. Sharp, 31 Oh. St. 611; Minor, Conf. Laws, §§ 155, 157; Bishop, Cont. § 462; Thomson & Houston Ele. Co. v. Palmer, 52 Minn. 174, 179, 180.

That construction will be given to a contract which will render it valid if it can reasonably be done. Dickinson v. Edwards, 77 N. Y. 573, 578; Bishop, Cont. §§ 391, 392; Pritchard v. Norton, 106 U. S. 124. The pledge of the oats is valid under Minnesota law. An examination of the act of 1876 (c. 86) shows that some of its provisions are remedial, and some penal. Sections 6, 7 and 8 are penal. Sections 2 and 3 are remedial and penal. Sections 4 and 5 remedial, while section 1 is purely remedial. (G. S. 1894, §§ 7645–7652). Remedial statutes must be construed liberally, penal statutes strictly; and in construing the statute partly penal and partly remedial, the penal provisions are to be construed strictly, the remedial provisions liberally. Endlich, Interp. St. §§ 107, 332; Potter's Dwarris, St. 262.

Prior to the act of 1876 the deposit had the effect of a sale. Hall v. Pillsbury, 43 Minn. 33, 35; National Exch. Bank v. Wilder, supra. It is a cardinal rule of interpretation that statutes are to be construed in reference to the principles of the common law, for it is not to be presumed that the legislature intended to make any innovation upon the common law further than the case absolutely required. The law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced. Keech v. Baltimore, 17 Md. 32; Sullivan v. La Crosse, 10 Minn. 308 (386); Packer v. Noble, 103 Pa. St. 188, 196; Sheetz v. Hanbests, 81 Pa. St. 100; Greenwood v. Greenwood, 28 Md. 370, 384; Shaw v. Railroad Co., 101 U. S. 557. The remedies specially created by the grain and warehouse law (act of 1876) are not exclusive. They were intended to be and are auxiliary to those previously afforded. Daniels v. Palmer, 41 Minn. 116, 119.

The pledge of the oats, being valid by Minnesota law, will be sustained by its courts, even if made in Massachusetts and under

its law. Minor, Conf. Laws, §§ 5–11; 2 Parsons, Cont. (8th Ed.) *570; In re Dalpay, 41 Minn. 532; Washburn v. Van Steenwyk, 32 Minn. 336; Varnum v. Camp, 13 N. J. L. 326; National Exch. Bank v. Wilder, supra; Thompson v. Thompson, 78 Minn. 379; State v. Cowdery, 79 Minn. 94.

To enforce in this state the Massachusetts rule governing the pledge of the oats, which this state laid aside in 1876, for a settled rule which has worked such enormous benefit to this state, would certainly be at this time in contravention of the established policy of the state and injurious to its interests. No state or nation will enforce a foreign law which is contrary to its fixed and settled policy. Armstrong v. Best, 112 N. C. 59; Despard v. Churchill, 53 N. Y. 192; Freeman's Appeal, 68 Conn. 533; Gardner v. Lewis, 7 Gill (Md.) 377; Saul v. His Creditors, 5 Martin (N. S.) *569; In re Dalpay, supra; May v. First National, 122 Ill. 551.

The pledge of the oats, being valid by Minnesota law, will be sustained by its courts, even if it would be invalid by the laws of Iowa, South Dakota, and Nebraska, as to the parts of the oats there stored. Minor, Conf. Laws, § 67; Baltimore v. Glenn, 28 Md. 287; Bank of Augusta v. Earle, 13 Pet. 519; Minor, Conf. Laws, § 119.

When the actual situs and the legal situs of personal property are separated, and are in different jurisdictions, the law of the actual situs may differ from the law of the legal situs. In such case the question may arise which law is to govern. The general rule is that the governing law is the law of the legal situs of personal property, the law of the situs of the owner. This is a rule of the common law, and prevails in every state where the common law is administered. Minor, Conf. Laws, § 120.

Appellants, in questioning the validity of the pledge of the oats in this court, have not the rights of attachment creditors, or rights of like nature, to any of the oats. Warner v. Jameson, 52 Iowa, 70; Salladin v. Mitchell, 42 Neb. 859, 863; Blair v. Stewart, 57 Neb. 58; Thomas Mnfg. Co. v. Drew, 69 Minn. 69.

The rule in the Wilder case is not abrogated by statute in Minnesota. The pledge of those parts of the oats stored in South Dakota and Nebraska would not be invalid, if governed by the

laws of those states. State v. W. W. Cargill Co., 77 Minn. 223; Nicollet Nat. Bank v. City Bank, 38 Minn. 85; Coffield v. State, 44 Neb. 418; Forrester v. Kearney, 49 Neb. 655.

The pledge of the oats is not invalid, because of indefiniteness in the receipt. Bishop, Cont. § 382; 1 Daniel. Neg. Inst. (5th Ed.) § 151; Weiland v. Sunwall, 63 Minn. 320.

The Iowa statute pleaded, being penal, is inoperative to invalidate the pledge of the part of the oats there stored. Fritts v. Palmer, 132 U. S. 282; Chattanooga, R. & C. R. Co. v. Evans, 66 Fed. 809; Jarvis-Conklin M. T. Co. v. Willhoit, 84 Fed. 514.

E. F. Merkle and Louis K. Hull, for respondent Security Bank of Minnesota.

Flannery & Cooke, for respondent Franklin L. Greenleaf.

George W. Buffington, for respondent Batavian Bank of La Crosse.

Wilson & Van Derlip, for assignees respondents.

BROWN, J.

The St. Paul & Kansas City Grain Company, a corporation formed under and pursuant to the provisions of the statutes of this state, having its principal place of business at the city of Minneapolis, owned and operated a large number of grain elevators and warehouses at different places in the states of Minnesota, Iowa, South Dakota, and Nebraska, and received in store grain belonging to others, and purchased and stored therein grain of its own; the different varieties, wheat, oats, and corn, being separately commingled in common mass. It shipped out, as occasion required, various quantities of such grain, receiving in place thereof other grain of like character. Its business was quite extensive, reached considerable proportions, and it became necessary from time to time to borrow money to enable it properly to conduct its affairs; as security for the repayment of which warehouse receipts were issued, and delivered to the persons of whom loans were made, specifying a quantity of grain then owned by the company, and by it stored in its elevators, which it intended to pledge as security. These receipts will be more particularly referred to

later on, but for present purposes the statement just made is sufficient.

On October 4, 1901, being heavily in debt, not only to secured, but to unsecured, creditors, and unable to meet its obligations, the company made a general assignment under the laws of this state for the benefit of all its creditors. At the time of the assignment it owned a large quantity of grain, wheat, oats, and corn, which was in store in the different elevators owned and operated by it in the states named, all of which, without objection by the receipt holders, the assignees took possession of, and converted into money, in the due administration of their trust. The warehouse receipts above referred to are not all alike in form, though similar in substance. That held by the Gardner National Bank is as follows:

ST. PAUL & KANSAS CITY GRAIN CO.

No. 1779.                    Minneapolis, Minn., Aug. 30th, 1901.

Received in store in our system of elevators and warehouses, seventeen thousand bushels of White Oats, subject to the order hereon of ourselves, on return of this receipt properly endorsed.

The grain represented by this receipt is fully covered by fire insurance for the benefit of the holder, and all charges are paid to February 28th, 1902.

*ST. PAUL AND KANSAS CITY GRAIN CO. Grain Buyers and Warehousemen. Elevators in Iowa, Nebraska, South Dakota and Minnesota. Countersigned, E. W. Folsom, Secretary.*

On the back of which appears the following indorsement, which must be treated, though not expressly referred to in the body of the receipt, as a part of the contract:

ST. PAUL & KANSAS CITY GRAIN CO.,
By J. Q. ADAMS, Pt.

| | |
|---|---:|
| Evanston, Ia. | 2,500 |
| Laurel, Neb. | 2,000 |
| Waltham, Minn. | 2,000 |
| Tea, S. D. | 2,500 |
| Lester, Ia. | 3,500 |
| Alvord, Ia. | 1,500 |
| Dixon, Neb. | 1,500 |
| Plainview, Neb. | 1,500 |
| | 17,000 |

The receipts held by the Security Bank of Minnesota and the First National Bank of South Weymouth are similar to the Gardner receipt, with the exception that in the body thereof are the words, "As per list on back," following the words, "Received in store in our system of elevators," etc. Those held by the Batavian Bank and F. L. Greenleaf on their face cover the quantity of grain therein stated "in our system of elevators and warehouses," without designation of particular warehouses where the same was stored. That held by the Cape Cod National Bank covers a stated quantity of grain in an elevator located in the state of Iowa. At the time of the assignment there were in store in the company's elevators the quantities of grain specified in the several receipts, and at the places named therein; but there is no evidence that the identical grain on hand at the time they were issued was in store at the time of the assignment. The receipts held by the Batavian Bank, F. L. Greenleaf, and the Security Bank secure the payment of promissory notes payable at Minneapolis, this state, while the other notes thus secured were payable in Boston, Massachusetts.

All of the creditors, including those holding such receipts, none of whom reside in the states of Iowa, Nebraska, or South Dakota, presented their claims to the assignees, and they were duly allowed as valid obligations of the insolvent company. The unsecured debts amount to about $450,000, and those secured by the receipts to about $140,000. The receipts cover the bulk of grain owned by the company at the time of the assignment, and its assets are insufficient to pay its debts in full. The creditors holding the receipts made claim to the assignees of a preference over and above the general creditors to the extent of the grain represented by the respective receipts, which were called to the attention of the court below, whereupon issues were ordered made up, and the matter brought to trial, resulting in a judgment confirming their right to a preference, and from an order denying a new trial the general creditors appealed. The whole controversy is between the receipt holders, asserting a right of priority, on the one hand, and the general creditors, disputing the right, on the other; and the question to be determined is whether the former

are entitled, in the distribution of the insolvent company's estate, to their asserted right, either partially or to the full extent of the grain represented by their respective receipts. The receipts relied upon are claimed by the holders thereof to constitute pledges of the grain named in each, and the decisive question is, by what law is their validity to be determined? A large number of errors are assigned, but, without referring specially to them, we come at once to a consideration of the merits of the case.

1. It may be well first to consider briefly the duties of an assignee under our statutes, and the relation he bears to the creditors in respect to an application of the property of the assignor to the payment of their claims. If the assignees in this proceeding, as to any portion of the pledged grain, as contended by counsel for receipt holders, occupy the position of the assignor, with no greater rights or duties, and are required to apply the property coming into their hands precisely as the assignor would have been required to do by law had no assignment been made, and on the basis that contracts entered into between the assignor and his creditors must be performed because valid and enforceable between the parties, some of the other questions presented would be very much simplified.

The general rule of the common law is that an assignee for the benefit of creditors stands in the shoes of the assignor; represents him; takes the assigned property subject to all transfers and incumbrances, whether fraudulent as to creditors or not, and subject also to all equities existing between the assignor and any particular creditor. But this rule has been changed in this state by our statutes on the subject of assignments, and the assignee represents the creditors, and not the assignor. Walsh v. St. Paul S. F. Co., 60 Minn. 397, 62 N. W. 383; Thomas Mnfg. Co. v. Drew, 69 Minn. 69, 71 N. W. 921; Kellogg v. Kelley, 69 Minn. 124, 71 N. W. 924. He receives the property belonging to the insolvent estate, converts it into money, and pays and discharges the debts by equal proportional distribution among the creditors, recognizing valid and subsisting contracts theretofore entered into by the assignor, and instituting proceedings to set aside all such conveyances and transfers as are fraudulent or void as to creditors.

Being clothed with this authority by express legislative enactment (G. S. 1894, § 4233), it becomes a duty, and the faithful performance of his trust requires, that he proceed in a proper way against all fraudulent or void contracts of his assignor; thus rendering unnecessary individual suits by the latter to test the validity of transfers and conveyances made by the assignor before assignment, preventing one creditor from obtaining an advantage over another, and making possible an equal distribution of the estate among those entitled to it. No rights are lost to the creditors by the assignment. The right to question fraudulent or void transfers of property still exists, but must be enforced through the assignee.

The authority thus conferred extends to all property of the assignor passing by the assignment to the assignee, whether within or without the state. It would not do to hold that an assignee appointed under the laws of this state possesses, as to property belonging to the trust estate having an actual situs in another state, such power and authority only as is conferred by the laws of such other state, whether as broad and comprehensive as is conferred by our laws or not. To do so would be destructive of the purposes of our insolvency laws, open the doors for rivalry and contests between individual creditors in their efforts to secure liens by attachment or garnishment in respect to the property in the other state, the prevention of which, and an equal distribution of all the property of the insolvent, is the primary object of our statutes. His power and authority must be measured, as to all property covered by the assignment, by the laws of the state where the assignment was made and the trust is being administered. It is a question of procedure, remedy, and the law of the forum applies. Lewis v. Bush, 30 Minn. 244, 15 N. W. 113. By any other rule, where property is situated in several states, the assignee might occupy a dual position. As to property within this state he would represent the creditors, and as to property without the state he would represent the assignor, if such were the law of the other state, with no power to call in question fraudulent transfers. This would result in confusion, and be subversive of all modern insolvency or bankruptcy statutes.

None of the secured creditors in the case at bar are citizens of the states of Iowa, Nebraska, or South Dakota, where a part of the trust estate was located at the time of the assignment, asserting rights as such under the laws of those states, but are residents of other states, including Minnesota, and have come into this proceeding, pending in this state; and their rights, in so far as pertinent to the authority of the assignees, are fixed by the laws of this state—the lex fori. What would have been their rights had they seized the property in the other states, and contested the right of the assignees to take possession of it except subject to the pledge, and had not appeared in this proceeding, we need not determine. But from what has been said it must follow that the assignees in the case at bar represent the creditors, with power and authority to do all that they, individually or collectively, could have done to subject the property of the insolvent debtor, wherever located, to the payment of their claims; and that the creditors have, through them, the rights of attaching creditors. Walsh v. St. Paul S. F. Co., 60 Minn. 397, 62 N. W. 383. If the general creditors could, by appropriate proceedings in the courts of Iowa, Nebraska, or South Dakota, have effected a cancellation or defeated the pledge here relied upon by the receipt holders to the extent of the grain located in those states—as it must be conceded they could have done, if invalid there—the assignees may accomplish the same end in this proceeding in this state, for, as we shall presently see, the validity of the pledges as to grain having an actual situs in those states must be determined by their laws.

2. It is contended by the general creditors that the contract and pledge relied upon by the Gardner National Bank is a Massachusetts contract, its nature and validity to be determined by the laws of that state. The facts with reference to this claim are somewhat similar to those of other receipt holders, and we state them briefly. Fogg Bros. & Co. were bankers residing and doing business in the city of Boston, Massachusetts. The grain company was a Minnesota corporation, with its principal place of business at Minneapolis, this state. The company telegraphed Fogg Bros. & Co., asking for a loan of $5,000, to be secured by a ware-

house receipt for seventeen thousand bushels of oats then in store in the grain company's elevators.   The Boston firm agreed to make the loan, whereupon the grain company made its promissory note to J. Q. Adams, its president, for the sum of $5,000, which was immediately indorsed by the payee to Fogg Bros. & Co., and, with a warehouse receipt for seventeen thousand bushels of oats issued by the grain company, mailed by the latter to Fogg Bros. & Co. at Boston.   At the time of so mailing the note and receipt the grain company made draft on the Boston firm for the amount of the loan, which was subsequently honored by them. Fogg Bros. & Co. thereafter transferred the note and receipt to the Gardner National Bank.

We are of opinion that the place of this contract, in so far as the pledge is concerned, at whatever other place it may be said to have been made, was not Massachusetts.   The phrase "lex loci contractus" is defined to be the law of the place with a view to which a contract is entered into, or by which it must, by reason of its subject-matter or nature, be governed or performed; in other words, the law which the parties either expressly or presumptively incorporated into their contract.   Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102; Pinney v. Nelson, 183 U. S. 144, 22 Sup. Ct. 52.

The intention of the parties is an element to be considered in determining the place of a contract, though their intention may not, perhaps, be always controlling; but it is within their power ordinarily to fix the place by express agreement.   Smith v. Parsons, 55 Minn. 520, 57 N. W. 311.   The contract here involved does not fix the place by the laws of which the parties intended to be bound, nor are the surrounding circumstances or the nature of the contract such as to justify us in holding that they contracted with a view to the laws of Massachusetts.   Though the promissory note was payable in Massachusetts, the security held for its payment was property situated partly in Minnesota and partly in Iowa, South Dakota, and Nebraska, and could not be enforced except in those states; and from this the reasonable inference is that, as to the security, at least, the pledged grain (the pledge being independent of, though accessory and an incident to, the principal contract), the parties had in view the laws

of the states where the pledged property was actually situated, and where it must be performed or enforced. So that, though the principal contract may be said to be governed by the laws of Massachusetts, because payable and to be performed there, the pledge was not to be performed, nor can it be enforced, in that state.

3. This brings us to the question applicable to all the receipt holders, and one of the more serious and important controversies in the case, namely, by what law is the validity of the receipts as pledges to be tested and determined. It is the contention of appellants, the general creditors, that their validity is to be determined by the laws of the states where the pledged grain was actually situated at the time the receipts were issued and delivered, and that by the laws of Iowa, Nebraska, and South Dakota such pledges are invalid as here attempted to be created. It is the contention of the respondents the receipt holders that their validity is to be determined by the laws of this state, that being the place of the contract, and the forum in which their validity is questioned. A number of the receipts cover specific quantities of grain stored in the different states named, and, if appellants' position be sound, they have a double operation, and are to be construed distinctively and according to the laws of the states where the different quantities of grain are located. Pope v. Nickerson, 3 Story, 465, Fed. Cas. No. 11,274; Hartmann v. Louisville, 39 Mo. App. 88, 95; Pomeroy v. Ainsworth, 22 Barb. 118; Faulkner v. Hart, 82 N. Y. 413, 420.

The authorities upon this question are by no means harmonious. An examination of them discloses a very decided conflict in the views of different courts and text-writers. The lex loci contractus, as generally understood, is not made by any of them the final test as to the validity of contracts respecting personal property, except perhaps, as to formalities in execution (Dacosta v. Davis; 24 N. J. L. 319), but as to their essence or essential validity other rules are applied. 22 Am. & Eng. Enc. (2d Ed.) 1328.

There is an old rule or fiction of the law that personal property has no situs apart from its owner; that, though such property may have an actual situs different from the domicile or residence

of its owner, its situs for all purposes of the law is with the owner, termed the legal situs; and some courts cling with tenacity to this rule, and are guided by it in a great measure in determining rights in reference to such property.  The rule has always been that the validity of contracts and transactions concerning real property, both as to formality and essence, is to be determined by the laws of the place where the property is situated.  22 Am. & Eng. Enc. (2d Ed.) 1337.  And there would seem to be no logical reason why the same rule should not apply to personal property as well.  The only plausible reason for not applying it is found in the legal fiction that such property has no situs apart from its owner.  As remarked by the Supreme Court of the United States—Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, 11 Sup. Ct. 876:

"The old rule expressed in the maxim, 'Mobilia sequuntur personam,' by which personal property was regarded as subject to the law of the owner's domicile, grew up in the Middle Ages, when movable property consisted chiefly of gold and jewels, which could be easily carried by the owner from place to place, or secreted in spots known only to himself.  In modern times, since the great increase in amount and variety of personal property not immediately connected with the person of the owner, that rule has yielded more and more to the lex situs, the law of the place where the property is kept and used"—citing Green v. Van Buskirk, 5 Wall. 307, and 7 Wall. 139; Hervey v. Rhode Island L. Works, 93 U. S. 664; Harkness v. Russell, 118 U. S. 663, 7 Sup. Ct. 51; Story, Confl. Laws (8th Ed.) § 550; Wharton, Confl. Laws (2d Ed.) § 297, et seq.

It is a rule of general application that the validity of contracts is to be determined by the laws of the place of performance.  22 Am. & Eng. Enc. (2d Ed.) 1325; London Assurance Co. v. Companhia de Moagens Do Barreiro, 167 U. S. 149, 17 Sup. Ct. 785; Coghlan v. South Carolina R. Co., 142 U. S. 101, 12 Sup. Ct. 150; Beggs v. Bartels, 73 Conn. 132, 46 Atl. 874; Pittsburgh v. Sheppard, 56 Oh. St. 68, 46 N. E. 61; Burnett v. Pennsylvania, 176 Pa. St. 45, 34 Atl. 972; Hubble v. Morristown, 95 Tenn. 585, 32 S. W. 965; Scudder v.

Union Nat. Bank, 91 U. S. 406; Waverly v. Hall, 150 Pa. St. 466, 24 Atl. 665; Shoe v. Wood, 142 Mass. 563, 8 N. E. 753; Abt v. American, 159 Ill. 467, 42 N. E. 856; Seamans v. Christian Bros. Mill Co., 66 Minn. 205, 68 N. W. 1065.

And this rule is uniformly followed as to promissory notes, and perhaps chattel mortgages, unless a contrary intent of the parties is shown. It was followed and applied in Ames v. Benjamin, 74 Minn. 335, 77 N. W. 230. In that case, defendant, a resident of this state, made and delivered to plaintiff his promissory note payable at Wahpeton, in the state of North Dakota, to secure the payment of which he executed a chattel mortgage upon property situated in this state. In an action in replevin by the mortgagee for the mortgaged property, brought in this state, in which the mortgagor interposed the defense of usury, the court held that the validity of the contract was to be determined by the laws of the state of North Dakota, because that was the place of performance. No objection was made to the validity of the mortgage aside from the claim that it was void because it secured the payment of a promissory note void for usury.

There are numerous authorities which hold that, where the subject-matter of a contract is personal property which has an actual situs in a state other than that of the forum where its validity is questioned and the domicile of the parties, the latter two concurring, the law of the state where the property is so located will not be applied in interpreting the contract, if to do so would violate the law of the forum or impair the rights of domestic creditors. Minor, Confl. Laws, § 6, et seq. And respondents urge with much earnestness that the validity of the receipts in question should not, in this state, be determined by the laws of the states of Iowa, Nebraska, or South Dakota; that the laws of those states should not be imported into this, for to do so would violate the settled policy of our laws in respect to such transaction, and impair the rights of domestic creditors.

It seems to us that this rule, if it can be said to apply to the facts before us, cuts both ways. We have no creditors in this proceeding, residents of the states named, asserting rights under their laws. All those here interested, both secured and unsecured,

may be treated as residents of this state; some of them are such in fact; and, if the receipt holders may be heard to say that it would be an injustice to them to determine the validity of their contracts by the laws of those states, the general creditors, also residents of this state, could with equal propriety contend that to apply the statutes of Minnesota would be unjust to them. To ignore the laws of the states where the property was in fact situated, and with reference to which the parties must be deemed to have contracted, and where the contract must be performed, and infuse life and validity by an application of our laws into that which, without such action of the court, would be wholly invalid, would extend to them greater rights than they had before the assignment. There is force in this suggestion, for it must be conceded that the general creditors could, prior to the assignment, have seized the pledged grain situated in those states, and defeated the pledges as to the receipt holders, though perhaps not as to the assignees. Bacon v. Horne, 123 Pa. St. 452, 16 Atl. 794.

Some courts have apparently ignored many of the theories and fictions of the text-writers, and aimed to place contracts concerning personal property upon the same basis with contracts respecting real property, by applying the law of the actual, rather than that of the legal, situs. Prominent in this line is the Supreme Court of the United States. These courts apply the principle, which has always been unyielding in respect to real property, that every state, by virtue of its own sovereign power, has the right to regulate persons and things within its territory, and to provide and control the method and manner of sale, incumbrance, or other transfer of property therein. Green v. Van Buskirk, 7 Wall. 139; Hervey v. Rhode Island L. Works, 93 U. S. 664; Dooley v. Pease, 180 U. S. 126, 21 Sup. Ct. 329; Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102; Loftus v. Farmers, 133 Pa. St. 97, 19 Atl. 347. This rule is also laid down by many of the text-writers. Wharton, Confl. Laws (2d Ed.) § 297, et seq.; Story, Confl. Laws (8th Ed.) § 383; Foote, Priv. Int. Law, 236.

But we need not review the authorities further. It would serve no good purpose, and we refrain. Without attempting to lay down any abstract rules on the subject, we have no difficulty in

holding in this case, applying tho general rule that the validity of contracts is to be determined by the laws of the place of performance, that as to the portions of grain having an actual situs in the states of Iowa, South Dakota, and Nebraska, the nature of the contract being such as to require its performance and enforcement in those states, the validity of the receipts as pledges of such grain must be determined by their laws. There being nothing in the contracts to show a contrary intention, conceding that such an intention might be effectual in a case of this kind, the inference is that the parties contracted with a view to the laws of those states; and those states as to the grain located therein, became the "venue of their agreement." In reaching this conclusion we are not importing foreign laws to the detriment of domestic creditors. All parties before the court occupy the position of domestic creditors, are before the court with such rights as they possessed immediately preceding the assignment, in which they are entitled to protection. In determining what those rights are, we apply the rules of the universal law, the common law, to an undisputed state of facts. The general creditors are not attempting to establish rights under foreign laws. They are simply contending against a right of priority in the distribution of the insolvent company's estate asserted by the receipt holders, and we are to determine whether that right in fact exists; and the rule which precludes the courts of one state from giving effect to the laws of another state, when to do so would impair the rights of domestic creditors, can have no application to the case.

4. We come, then, to the question whether the receipts are valid under the laws of those states. The contention that they are valid by force of the statutes of this state will be considered when that subject is reached. It is elementary that a valid pledge of personal property can be created only by a delivery to the pledgee of either an actual or constructive possession of the pledged property. The delivery of a recognized symbol of title, such as a warehouse receipt issued by a warehouse as owner, is sufficient as a constructive delivery. But in such case the identical property must be retained by the pledgor as bailee of the pledgee. Other property of like character and kind cannot be substituted. Na-

tional Exch. Bank v. Wilder, 34 Minn. 149, 24 N. W. 699. This is the common-law rule, and is presumed to be the same in all the states.

There is no explicit finding, or any evidence in the case before us to the effect that the identical grain owned by the grain company at the time the receipts in question were issued, and which it intended to pledge, was retained by it, or was in its possession at the time of the assignment, but the contrary clearly appears from the record. The grain received and stored by it during its business career was constantly undergoing changes by additions to and shipments from the common mass in the usual course of business. The contention on this phase of the case by counsel for the Security Bank, to the effect that the grain company did retain the oats covered by its receipt, is not supported by the record. If the findings of the trial court can be said to support this contention, they cannot be sustained. The evidence points the other way. So that none of the receipts constitute a valid pledge at common law; and, unless there be some statutory provision in the states named modifying and extending that rule, as in this state, they are wholly invalid as to creditors of the grain company.

There is such a statute in the state of Iowa, but, for the reason that the receipts were not issued in compliance with its provisions, they are invalid under it. This was conceded at the argument by one of the counsel for the receipt holders, and the others do not claim that the statutes of that state were complied with. It is contended, however, that, as the Iowa statute provides in detail the manner in which pledges of this character may be created, and for a violation of any of its provisions a penalty is imposed, and a cause of action for damages given the injured party, the penalty provided is the exclusive remedy, and that the pledges, though not in compliance with the statutes, are valid. We see no strength in this argument. A contract entered into in contravention of express law is wholly void.

It does not seem to us that the statutes of the states of South Dakota and Nebraska leave the question in serious doubt as to those states. The provisions of the South Dakota statute, which are substantially similar to those of Nebraska, provide generally

for the issuance of warehouse receipts by the owners of elevators and warehouses to depositors of grain, and particularly that

"No warehouse receipt shall be issued except upon actual delivery of grain into store in the warehouse from which it purports to be issued, and which is to be represented by the receipts, nor shall any receipt be issued for a greater quantity of grain than was contained in the lot or parcel stated to have been received." [2]

No provisions are found in the statutes of either state authorizing a warehouseman to issue such receipts for his own grain as security for the payment of his debts, and, taking all the statutory provisions of those states bearing upon this subject together, it is quite clear that the lawmakers had no intention of modifying or changing the common law as to pledges of personal property. On the contrary, the fair import of the statutes is that they were intended as a regulation of the business of marketing and storing grain and other farm products as between the warehouseman and an actual depositor. Section 5534, An. St. S. D. 1901, expressly provides that a transfer of personal property as security creates a lien only when accompanied by an actual change of possession of the property intended to be pledged, and there is nothing in the warehouse laws of that state to indicate an intention on the part of the legislature to repeal or modify that statute. We were cited to no case in either of the states named construing their statutes on this subject, and we give them such construction as seems consistent with legal principles, and hold that they do not authorize the pledge of grain owned by a warehouseman in the manner here attempted.

The statutes of those states are quite different from our act of 1876 (Laws 1876, p. 96, c. 86), in this: That the act of 1876 contains no restrictions as to when or to whom receipts of this kind may be issued. It requires that they be issued on the deposit of grain with a warehouseman, but does not, as in South Dakota and Nebraska, expressly forbid their issuance except upon an actual deposit of grain. There being no such restriction contained in the act of 1876, this court, in the Wilder case, held that a warehouse-

[2] Statutes (S. Dak.) 1890, c. 99, § 245.

man might issue receipts for his own grain as security for loans of money; but such construction cannot be given to the statutes of those states except by ignoring their express language.

5. But it is strenuously contended by counsel for the receipt holders that the receipts are valid by force and reason of the statutes of this state, not only as to the parts of grain actually situated therein, but as to the grain situated in the other states as well; while the converse of the proposition is urged with equal force by counsel for the general creditors, who insist that the receipts are invalid even as to grain in this state—First, because the rule of Nat. Exch. Bank v. Wilder, 34 Minn. 149, 24 N. W. 699, has been abrogated and changed by Laws 1895, p. 313 (c. 148); and, second, because the receipts are indefinite and uncertain, and designate no particular grain as the subject of the pledge. We have no particular difficulty in applying the rule of the Wilder case to the receipts in question, in so far as they cover grain situated in this state. That decision, based upon the statutory provisions of the act of 1876 (Laws 1876, c. 86), established a rule that has since been followed in one of our great branches of commerce, and, if it is to be departed from, it should be by express legislation. It has become a rule of property right, a legally sanctioned rule of business, and has been relied upon by the bar and business circles, and should not be disturbed. It was not abrogated or changed by the act of 1895. Though the two acts are in some respects dissimilar, it was not the intention of the legislature by the later act to change the rule. Had they so intended, language would have been employed to that end which would not have required a judicial interpretation to ascertain the meaning of the lawmakers.

And we are also of opinion, and so hold, that those receipts which cover grain "in our system of elevators," without designation of particular elevators, are also valid as to grain of the kind specified therein stored in elevators in this state, and are not so indefinite and uncertain as to render them ineffectual or void. The appropriation of grain to the contract is as definite, specific, and certain as in the receipts which designate particular elevators. In either case the identical grain in store at the time of the

issuance of the receipts is not retained by the warehouseman. Grain in all elevators of the kind is constantly undergoing changes by shipments from and additions to the common mass, and it is generally understood in business circles that the grain actually on hand at any particular time may be subject to the claim of receipt holders. No notice is given of the issuance of such receipts, whether for grain in a particular elevator or covering grain in all the elevators owned by the warehouseman. The only protection furnished those dealing with the warehouseman is the general understanding of the nature of such business and the method of its transaction. These blanket receipts come fairly within the principle of the Wilder case, and, following that decision, we sustain them.

But we are unable to concur in the contention of respondents that all the receipts are valid as to all the grain, wherever actually situated at the time they were issued, by force of the statutes of this state. It is an elementary rule that statutory law has no extraterritorial effect. Statutes of a state have no effect ex proprio vigore beyond its own limits, and, even if a legislature should intend its laws to apply to persons and property in other states, its enactments in that direction would be wholly inoperative and void. It is beyond the power of a state to impose its laws upon another state, or to provide that contracts entered into in accordance with its laws shall be valid and enforceable in a foreign jurisdiction; and it is clear that the legislature of our state did not intend its warehouse statutes to apply to transactions in reference to grain actually in store in elevators in some other state. We are unable to concur in the ingenious argument of counsel for respondents in this respect, and apply the general rule which limits the operation of statutory law to the state of its enactment.

It is not important, as argued in the Security Bank case, whether the general creditors gave credit or altered their position after the receipts were issued to that bank. The legal rights, not the equitable, are alone involved. The same reasoning would sustain an unrecorded chattel mortgage.

It follows that the order denying a new trial must be reversed

as to the Security Bank, the Gardner National Bank, First National Bank of Weymouth, and the Cape Cod National Bank, but affirmed as to F. L. Greenleaf and the Batavian National Bank. As to the latter two the receipts cover grain in the system of elevators owned by the grain company without specification as to particular elevators, and are valid, being construed to apply to grain in store in elevators within this state.

Reversed, in part.

On April 13, 1903, the following opinion was filed:

PER CURIAM.

Since the foregoing opinion was filed, our attention has been called to the fact that one of the receipts held by the Batavian Bank and that held by F. L. Greenleaf cover the specific article of corn, and the further fact that at the time of the assignment the grain company had no corn in any of its elevators in Minnesota. This being so, the affirmance of the order appealed from as to those claimants was erroneous, and should be corrected.

It is therefore ordered that the order appealed from be reversed, and the cause remanded for further proceedings. The former order herein is modified accordingly.

Order denying new trial reversed.

